STATE OF NEBRASKA, APPELLEE, V. ROBERT
PATTERSON, APPELLANT.
331 N.W.2d 500

Filed March 11, 1983. No. 82-179.

Larry E. Butler, Buffalo County Public Defender, for appellant.

Paul L. Douglas, Attorney General, and Dale D. Brodkey, for appellee.

KRIVOSHA, C.J., BOSLAUGH, McCOWN, CLINTON, WHITE, HASTINGS, and CAPORALE, JJ.

KRIVOSHA, C.J.

In the case of *State v. Palmer,* 210 Neb. 206, 218, 313 N.W.2d 648, 655 (1981), this court, joining with a growing number of other jurisdictions, held that "until hypnosis gains acceptance to the point where experts in the field widely share the view that memories are accurately improved without undue danger of distortion, delusion, or fantasy, a witness who has been previously questioned under hypnosis may not testify in a criminal proceeding concerning the subject matter adduced at the pretrial hypnotic interview." The instant appeal presents to us the further question as to whether a witness who has been subjected to hypnosis may testify under any circumstances as to matters adduced prior to hypnosis. In the instant case the trial court permitted such testimony. For reasons which we more particularly set out in this opinion, we believe the trial court was correct under the circumstances and we affirm the judgment.

The appellant, Robert Patterson, was convicted of sexually assaulting a 21-year-old Kearney State College student during the early morning hours of June 3, 1981, in Kearney, Buffalo County, Nebraska, in violation of Neb. Rev. Stat. § 28-319 (Reissue 1979). Following trial and conviction, Patterson was sentenced to a term of imprisonment in the Nebraska Penal and Correctional Complex for not less than 5 nor more than 10 years. The evidence was to the effect that after the victim of the attack had completed working at a local restaurant at approximately 1 a.m., she changed into her jogging clothes and started to jog home, a trip which normally took 7 minutes. As she was jogging home she was attacked by a male assailant. For our purposes it is unnecessary to set out in detail the facts of the assault, except to say that, if believed by the jury, the

facts were sufficient to establish that the victim was forcibly knocked to the ground and sexually assaulted. While the assault was taking place, a car entered upon the street where the assault was occurring. The victim screamed. The car pulled up to the house next to where the victim and her assailant were located, and the assailant got up and ran off to the northeast. The occupants of the car, a man and a woman, got out of the car and assisted the victim into the house.

At the trial, the male occupant of the automobile testified that as he turned onto the street he saw something going on in his front yard. As he drove closer he saw that it was two individuals engaged in what appeared to be a sexual act and he heard screams. As he stopped his car he observed the male assailant flee, and he and his female occupant assisted the victim into the house.

Two officers of the Kearney Police Department testified at trial that within a few minutes of receiving a call concerning the assault they went to the eyewitnesses' home where the victim was. Inside the house one of the officers interviewed the victim, who told him what had occurred and gave him a clear description of the assailant. The second officer likewise testified that he arrived shortly after the first officer and while the first officer was still interviewing the victim. The victim was then taken to a local hospital where, according to her roommate who arrived shortly thereafter, she again related the incident and described the assailant.

A further interview was held with the victim by the police the following afternoon, where, again, the victim was interviewed by a detective of the Kearney Police Department. The victim once again related what had occurred and described her assailant as best she could remember. Her description fit the appellant, although she could not positively identify him. Written police reports of the inter-

views were prepared at or shortly after the interviews and were available at trial.

During the initial investigation, shortly after the assault, one of the officers searched the area where the assault had occurred and found a set of keys belonging to the victim, which she said were in her hand at the time the attack occurred. Also found near the keys were some auction house receipts and a cash register slip bearing numbers later identified as having been issued to Patterson. The officer went to the auction house with the receipts and determined that Patterson had been at the auction house on the evening of June 2, 1981, and had purchased the seven or eight items for which the receipts were issued. An employee of the auction house testified that Patterson returned the next day and attempted to pick up the items which he had purchased the previous evening. He was unable to produce his receipts and told the employee that he had lost the receipts. In court the employee identified the receipts and cash register slip which the officer had found. During a conversation with one of the officers, Patterson admitted that he had lost both his checkbook and the auction receipts to the things he had bought at the auction house the previous night, but did not know where he had lost them. Patterson was thereafter arrested and charged with the crime.

On June 23, 1981, the victim was placed under hypnosis by a clinical psychologist. While under hypnosis, she again related all of the matters which she had previously related to the police officers and to her roommate. The only additional matter adduced as a result of the hypnosis was a description of an automobile. The automobile turned out to be of no material consequence in the trial.

Following the hypnotic session the victim was shown eight men in a lineup, including Patterson. She was unable to identify Patterson as her assailant

and, in fact, never positively identified Patterson as her assailant.

Patterson argues that by reason of our holding in *State v. Palmer,* 210 Neb. 206, 313 N.W.2d 648 (1981), the victim in this case was precluded from testifying as to any matters involving the crime which were discussed during the hypnotic session, even though the evidence is clear and convincing that the victim related all of the matters to others long before she was placed under hypnosis. Unlike the situation in *Palmer*, no previously unknown facts were adduced during the hypnotic session.

We can begin our analysis of this problem by stating that direct evidence obtained solely by reason of hypnosis is inadmissible per se. See *State v. Palmer, supra.* That, however, is not the issue presented to us in this appeal. The question is not whether evidence previously unknown and adduced by reason of hypnosis is admissible but, rather, whether evidence obtained without the benefit of hypnosis and clearly admissible becomes inadmissible simply by reason of the fact that, after relating the facts to a number of witnesses, the facts are once again related to one who purports to be able to hypnotize the witness.

In *State v. Palmer, supra,* we pointed out that there were two lines of authority and that we opted to join those jurisdictions which made hypnotically induced testimony inadmissible per se. Among those jurisdictions are Minnesota, *State v. Mack,* 292 N.W.2d 764 (Minn. 1980); Arizona, *State v. Mena,* 128 Ariz. 226, 624 P.2d 1274 (1981); and Michigan, *People v. Gonzales,* 108 Mich. App. 145, 310 N.W.2d 306 (1981).

The rationale of those cases was that hypnosis can create a memory of perceptions which did not previously exist and therefore may bring forth a memory of events which were nonexistent but which may become fixed in the witness' mind so that the witness believes them to be true after hypnosis. But

that rationale falls short when examining memories for which there is ample support for their previous existence. To assert that such memory is the product of hypnosis is to simply ignore the reality of the matter.

Since our decision in *State v. Palmer, supra,* Minnesota, Arizona, and Michigan have been presented with the question of the admissibility of prehypnotic testimony. In *State ex rel. Collins v. Superior Court, Etc.,* 132 Ariz. 180, 644 P.2d 1266 (1982), the Arizona court, after affirming its position on the inadmissibility of hypnotically induced testimony, said at 209, 644 P.2d at 1295: "[O]ur review of the literature and the position of law enforcement experts, lead us to conclude that hypnosis is generally accepted as a reliable investigative tool by the relevant scientific community. When used for prompting recall in order to provide valuable leads for investigation, hypnosis has less serious risks than the problems the technique presents when courtroom testimony is involved. Unlike a jury, an investigator need not make subjective evaluations of the truth or falsity of the hypnotic recall. He need only obtain leads for the purpose of subsequent investigation and verification.

"As a practical matter, if we are to maintain the rule of incompetency, the police will seldom dare to use hypnosis as an investigatory tool because they will thereby risk making the witness incompetent if it is later determined that the testimony of that witness is essential. Thus, applying the *Frye* test of general acceptance and weighing the benefit against the risk, we modify our previous decision and hold that a witness will not be rendered incompetent merely because he or she was hypnotized during the investigatory phase of the case. That witness will be permitted to testify with regard to those matters which he or she was able to recall *and* relate prior to hypnosis. Thus, for example, the rape victim would be free to testify to the occurrence of the crime, the

lack of consent, the injury inflicted and the like, assuming that such matters were remembered and related to the authorities prior to use of hypnosis."

The Arizona court observed that other courts which, like Arizona, had adopted a per se rule of inadmissibility have since modified that rule to permit prehypnotic testimony to be admitted in evidence when such evidence was obtained prior to the hypnosis. See, *Com. v. Taylor,* 294 Pa. Super. 179, 439 A.2d 805 (1982); *People v. Wallach,* 110 Mich. App. 37, 312 N.W.2d 387 (1981); *State v. Koehler,* 312 N.W.2d 108 (Minn. 1981); *State v. Blanchard,* 315 N.W.2d 427 (Minn. 1982); *People v. Jackson,* 114 Mich. App. 649, 319 N.W.2d 613 (1982); *Strong v. State,* ___ Ind. ___, 435 N.E.2d 969 (1982); *People v. Hughes,* 88 A.D.2d 17, 452 N.Y.S.2d 929 (1982).

We believe that such a rule would be consistent with our position in *Palmer,* in view of the fact that we specifically said in *Palmer* that hypnosis may be used for investigatory purposes and that testimony obtained as a result of leads supplied during such hypnotic investigation was admissible. We therefore now hold that a witness will not be rendered incompetent merely because he or she was hypnotized during the investigatory phase of the case; rather, the witness will be permitted to testify with regard to those matters which he or she was able to recall and relate prior to hypnosis, provided that there is sufficient evidence to satisfy the court that the evidence was known and related prior to hypnosis. How the court is to be satisfied must be determined on a case-by-case basis, and the authorities must therefore determine whether using hypnosis is worth the possible risk.

In this case the evidence is overwhelming that the commission of the assault, the lack of consent, and the description of the assailant were all known to the victim prior to her being subjected to hypnosis and were fully and adequately related to and reported by her to a host of law enforcement officers, as well as

others. It is clear that her memory of the events was not created by hypnosis. If the purpose of rendering hypnotically induced testimony inadmissible per se is to refuse to make that which is uncertain certain and admissible, it appears to follow, as day follows night, that evidence which is otherwise reliable and admissible should not thereby be rendered inadmissible because, after having been fully related and recorded, it is once more repeated during a purported hypnotic session. Patterson's assignment of error in this regard is overruled.

Patterson raises a second error concerning the State's failure to produce evidence previously ordered by the court. In an order entered by the court on August 20, 1981, the State was ordered to permit Patterson to discover "all reports or results of scientific tests and experiments made in connection with this case" and "all information in the possession of the County Attorney" which Patterson could use as favorable evidence. It appears from the evidence that a laboratory test was conducted on the keys belonging to the victim and found near the scene of the assault. The results of that test disclosed that there was no skin or blood on the keys and therefore the test was essentially negative. The State, however, failed to advise Patterson of this fact. Normally that would be reversible error and is a practice which should not be followed by the State. *Brady v. Maryland,* 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). An order of the court requiring the State to make such information available must be followed. However, in the instant case there is simply no prejudice entitling Patterson to a reversal of his conviction. The victim was unable to testify with certainty that in fact she had scratched her assailant with the keys. Also, the officers who questioned Patterson later in the day on June 3 were in disagreement as to whether Patterson displayed a scratch on his arm. One said he may have seen a red mark which had not bled, while the other was

unable to say. There was no testimony by anyone that the assailant was scratched or that the keys should possess evidence of skin or blood. Therefore, the failure of the State to disclose that evidence in the instant case was not material and did not in any manner prejudice Patterson, entitling him to a new trial. See, *Evans v. Janing,* 489 F.2d 470 (8th Cir. 1973); *State v. Boyer,* 211 Neb. 139, 318 N.W.2d 60 (1982); *State v. Seger,* 191 Neb. 760, 217 N.W.2d 828 (1974).

Patterson further claims that the trial court erred in not sustaining his motion for directed verdict made at the close of the State's case. We do not agree. The evidence presented by the State, if not rebutted, was sufficient to permit the jury to find guilt beyond a reasonable doubt. The most damaging evidence, besides the victim's description of Patterson, was the auction house receipts issued to Patterson and found at the scene of the crime. Admittedly, the evidence was circumstantial. That does not, however, preclude a finding of guilt. One accused of a crime may be convicted on the basis of circumstantial evidence if, taken as a whole, the evidence establishes guilt beyond a reasonable doubt. The State is not required to disprove every hypothesis but that of guilt. *State v. Buchanan,* 210 Neb. 20, 312 N.W.2d 684 (1981). It is not for this court to weigh the evidence when reviewing a criminal conviction. That is for the trier of facts. *State v. Carter,* 205 Neb. 407, 288 N.W.2d 35 (1980). Patterson's assignment of error in this regard must also be overruled.

Finally, Patterson argues the sentence was excessive. Under the circumstances, we believe not. Patterson's previous criminal record, taken together with the facts of this case, makes the sentence well within appropriate guidelines, and the sentence imposed fails to disclose any abuse of discretion. It has long been the rule that an order denying probation and a sentence imposed within statutorily pre-

scribed limits will not be disturbed on appeal unless there has been an abuse of discretion on the part of the sentencing judge. *State v. Roubideaux,* 199 Neb. 251, 257 N.W.2d 828 (1977); *State v. Welsh,* 202 Neb. 249, 275 N.W.2d 54 (1979); *State v. True,* 210 Neb. 701, 316 N.W.2d 623 (1982). The assignment is overruled.

For these reasons the conviction and sentence are in all respects affirmed.

AFFIRMED.

CLINTON, J., not participating.

WHITE, J., dissenting.

Without addressing the issue of confabulation that concerned us in *State v. Palmer,* 210 Neb. 206, 313 N.W.2d 648 (1981), the majority now retreats from the square holding in that case, that if the subject was brought up in a hypnotic session, the witness cannot be permitted to testify about the subject matter at trial. The opinion in *Palmer* fully explored the consequences of that holding. I am not convinced that the concerns we there expressed have now magically vanished. I would reverse.

I am authorized to state that McCown, J., joins in this dissent.